HOOD, Judge.
This is an action for damages in which plaintiff claims the value of numerous items of personal property which allegedly *667 were destroyed by fire. The suit was instituted by Morris E. Harwell against five defendants. Judgment on the merits was rendered by the trial court in favor of plaintiff and against three of the defendants, Blossman Hydratane Gas, Inc., Southwest Hydratane Gas, Inc. and Cenia Hydratane Gas Inc., for the total sum of $3,649.90. Plaintiff has appealed, contending that the amount of the award should be increased. Defendants have answered the appeal demanding that the award be reduced.
Only factual issues are presented on this appeal. They relate solely to the amount of damages, if any, which plaintiff should recover for three items of property which he contends were destroyed in this fire. These items are:
1. Oil well logs, oil field maps and notes, evaluations and analyses on the well logs and maps;
2. Mailing list and records for plaintiff’s lift truck business; and
3. Personal correspondence files.
The trial court allowed plaintiff $218.00 for the loss of oil well logs, maps and notes, and the additional sum of $3,000.00 for the loss of the mailing list and records for plaintiff’s lift truck business. No award was made for the loss of plaintiff’s personal correspondence files. Harwell contends that the award for oil well logs, maps and notes should be increased to $7,418.00, that the award for his mailing list should be increased to $20,000.00, and that he is entitled to an award of $35,584.55 for the loss of his personal correspondence files.
The evidence shows that on December 2, 1963, a building located on the premises of Cenia Hydratane Gas, Inc., in Alexandria, was destroyed by fire. Plaintiff maintained an office in that building, and he contends that practically all of the records and items of personal property owned by him and located in that building were destroyed in that fire. He contends particularly that the three items herein-above described were destroyed.
Plaintiff is 38 years of age, and at the time the fire occurred he was engaged in a number of business enterprises. His principal business at that time was the selling of “lift trucks.” He also was engaged, as entirely separate business ventures, in the selling of steel racks used for storing heavy items in warehouses, and in the selling of dry kilns which were being manufactured in Arkansas. He owned a one-half interest in, and was president and manager of, Associated Oxygen Company, Inc., in Alexandria, and he was part owner of the Oberlin Lumber Company, Inc., which operated a sawmill at Oberlin, Louisiana. He was in Oberlin in connection with the operation of the sawmill at the time the fire occurred.
In addition to his other business interests, plaintiff testified that he “dabbled” in the oil business in 1954 and 1955 and that he resumed his interest in that business about 1959 or 1960. In the early part of 1962, he participated in forming a corporation known as Harwell and Frye, Inc., for the purpose of producing oil. During the period beginning in January and ending in September, 1962, plaintiff, individually or through this corporation, undertook to drill five oil wells and to re-work another well. Although some of the wells were completed as producers, plaintiff testified that he sustained a net loss of $3,300.00 from that venture. He stated that he has devoted very little of his time to the oil business since August, 1962. He has made no other investments in that type of business since that time, and he apparently does not intend to do so. He testified:
“I learned two things about the oil business up there, number one is not to drill oil wells with my own money, your most successful operators up there don’t and number two, where to go to get your money and that’s what I intended to use that information for.”
*668 Plaintiff testified that at about the time Harwell and Frye, Inc., was formed he purchased five maps from Globe Map Company at a cost of $10.00 each, and he either purchased or was given about 100 oil well logs, which logs were being sold at that time for $1.68 each. His total investment in these maps and logs at the time they were acquired amounted to $218.00. Each of these maps showed the names of the owners of property and the location of each oil well which had been drilled in the area covered by that map.
Harwell testified that after he acquired these maps and logs he made “notes, evaluations and analyses” on them. According to his testimony, these notes reflected information obtained by him from a study of the various logs which had come into his possession and from information which he had gathered “on the basis of conversations that I had with people who had more experience in this field.” He testified :
“These notes, evaluations — these are an attempt by me to correlate a log with an existing well on property that joins some that I either had leased or was interested in leasing for the purpose of trying to determine just which way the sand was running, if it was pinching out in this area, or if there was prospects of hitting it higher over here in another area — in general I was trying to figure out where the oil was.”
Harwell contends that the notes, evaluations and analyses contained on these maps and logs enhanced the value of those documents by $7,200.00. By adding this amount to the original cost of the maps and logs he reasons that he is entitled to an award of $7,418.00 for the loss of those items. He concedes that he is not a geologist, that he has had no training or experience in the field of geology, and that his formal education after completing high school had consisted of attending Central College in Little Rock, Arkansas, for one year studying “business.” He stated that a few years ago he purchased and read a textbook published by the University of Oklahoma, which he described as “a basic textbook on geology for a beginner.” He refers to himself as a “shade tree” geologist, and by that we understand that he means that he has some practical knowledge of the subject although he has received no formal training in it. He testified:
“I’m not a geologist and it may be that from the standpoint of what I was doing it was all wrong technically, but I sort of thought I knew enough about it to be trying to make an oil well — there’s lots of oil wells been made by people that are not geologist.”
To support his testimony as to the value of the information which he had noted on the maps and logs, plaintiff produced the testimony of Mr. Dennis K. Johnstone, a qualified petroleum engineer. Mr. John-stone had never seen the maps or logs, and his testimony was based on the assumption that the information noted on them was accurate and up to date. He expressed no opinion as to the value of these items, but he did estimate the replacement cost of them, including the purchase price of the maps and logs and the cost of assembling all of the information which plaintiff said had been assembled and noting that information on these documents. In his opinion the replacement cost of the maps and logs, with all of the notations which plaintiff said was on them, would be about $7,418.00.
Although the information noted on the original maps and logs had been assembled by an untrained person, we note that Mr. Johnstone has based his estimate as to the “replacement cost” of these items on the expense which would be incurred by having a trained geologist assemble, correlate, analyze and record that information. Although he felt that it was not essential that the person who assembled and noted this information be a trained geologist, he testified that the information would be “relatively value *669 less” unless the person who assembled it “had-a certain degree of success in the oil business.” When asked if he would consider investing his own money on the basis of information assembled by a person with plaintiff’s training and experience, he answered, “In all probability not.”
As we have already noted, the trial judge awarded plaintiff $218.00 for the loss of the maps and logs, that being the original cost of these items.. In concluding that plaintiff was not entitled to recover the enhanced value which he claimed, the trial judge said, “The proof in this matter is what it would cost to put some information and evaluations on logs and maps by a geologist. Mr. Harwell is not a geologist and there is no proof that this work-up of his has any value at all. The law does not permit recovery on claims of this nature.”
We agree with the trial judge that the evidence fails to show that the information which plaintiff had assembled and noted on the above mentioned maps and logs was of any value. We conclude that the “notes, evaluations and analyses” added by plaintiff did not enhance the value of the maps and logs which were later destroyed, and that plaintiff is not entitled to recover more than the value of the maps and logs without those notations. We, therefore, affirm the award of $218.00 made by the trial court for this item of damages.
We will consider next the award made by the trial court for the loss of the mailing list and records which had been maintained by plaintiff in connection with his lift truck business. Plaintiff contends that the award should be increased substantially, while defendants contend that the evidence does not justify any award at all.
Plaintiff had been engaged in the business of selling fork lift trucks since 1950. Originally his sales territory included the eastern part of the state of Texas, most of the states of Louisiana, Mississippi and'Alabama and parts of Georgia and Florida. His territory was reduced from time to time, however, and when the fire occurred it included only the south half of the state of Mississippi, all of the state of Louisiana except the New Orleans area, and the southeastern part of the state of Texas.
In conducting his lift truck business, Harwell did a considerable amount of traveling from 1950 until 1959, and during that time he set up and maintained records of his customers and prospective customers on 5x7 inch cards. The information contained on these cards included the names and addresses of the people on whom he called, their titles, the make and type of lift trucks being used by the company, the dates on which those trucks were purchased, the dates on which he made his calls, the matters discussed and the accessories or items which he sold to them. He also included on these cards some personal information about the people on whom he called, such as the names of their children, their birth-dates, and personal characteristics which would assist him in identifying the customer by sight. He did much less traveling after 1959, but he continued to use the cards for information in writing to and telephoning customers in connection with his business.
Plaintiff kept these cards in alphabetical order, and in addition to the card files he also maintained a separate “master book” in which he arranged the names of the people listed on the cards by the areas in which their businesses were located. The trial judge found that plaintiff’s card file consisted of about 3000 cards, listing about that many actual or prospective customers. All of these cards and the master book were destroyed in the fire.
Harwell testified that these cards were of great value to him in selling fork lift trucks and in selling dry kilns. He stated that periodically he mailed literature and letters to his customers and prospective customers, and that he has been unable to do that since his mailing list was destroyed. He also testified that the loss of these cards has *670 affected his relationship with the people on whom he calls, and that for that additional reason the loss of them has injured his business. In his opinion each of these cards had a value of at least $10.00.
Mr. Alex Chapin, who was qualified as an expert appraiser, testified that in his opinion the card index which was described to him had a value of about $20,000.00. He, of course, had never seen the card file, but he assumed that it was “very, very complete and very concise.” He explained that the appraisal which he made represented the “sound value for the operation of a going business,” and that it did not represent the market value or selling price of the list. He stated, “All I have established is the value of this list as a going business and what this man might realize if he wanted to sell his territory and with that territory sell his list.” He conceded that if a portion of the cards could be duplicated, and particularly if the names and addresses of actual customers with the equipment each had purchased could be obtained from the parent company, then his appraisal of the value of the card file itself would have to be reduced.
As we have already noted, the card file was built up largely during the period extending from 1950 to 1959, and it included customers in North Mississippi, Alabama and Georgia. These last mentioned areas had been withdrawn from plaintiffs sales territory prior to the fire. Although plaintiff testified that the list was of considerable value to him in selling dry kilns in those areas, Mr. Chapin placed a higher value on the list because it related to the “fork lift business” and he stated that it was “of an unusual value in a very specialized field.” We gather from the testimony of this expert that the list would not be as valuable if it were to be used in some other type business, such as the selling of dry kilns. Also, plaintiff testified that after 1959 the majority of his business came from “old customers,” that the home office of his company had a list of all of his customers, and that he could “reconstruct a list of the users of the equipment from the home office.” We realize that any such reconstructed list would not contain the personal notations which plaintiff had included on his original cards, but we think the fact that the names and addresses of the actual customers were readily available from the home office, with information as to the equipment which each had purchased, is a circumstance which somewhat reduces the value which the card file otherwise might have had.
We believe that the card file which was maintained by plaintiff, containing the information which he described as to his customers and prospective customers, was of great value to him in conducting his business of selling fork lift trucks over a large area. We are convinced, however, that this card file did not have the value which he or Mr. Chapin placed on it. We have carefully reviewed all of the evidence, and we cannot say that the trial court erred in awarding plaintiff $3,000.00 for the loss of these records. We thus affirm the award made for that item.
We turn now to a consideration of the award made by the trial court for the loss of plaintiffs personal correspondence files.
Since 1948, Harwell has written many letters to persons of national and international prominence. He belongs to several organizations, including Liberty Lobby, Christian Crusade and the John Birch Society, all of which encourage their members to write letters to persons holding high political office. He testified that he has written letters to many such people, including Synghman Rhee, Dwight D. Eisenhower, Lyndon B. Johnson, Hubert H. Humphrey, Senators Robert Taft, Barry Goldwater, Strom Thurmand, Allen J. Ellender, Russell B. Long, Wayne Morse, J. W. Fulbright, James O. Eastland, John Stennis and to many others. He stated that the letters were written “partly to influence legislation * * * and partly too I enjoy writing and receiving answers from these people. * * * ” He stated that *671 he had received replies to practically all of the letters which he wrote, and that he had kept copies of the letters which he had written as well as the original replies which he had received. All of this correspondence was destroyed by the fire which occurred on December 2, 1963.
Plaintiff named from memory 36 prominent people to whom he had written and from whom he had received replies. He estimated that he had received a total of 254 letters from these 36 persons. He also testified that he had written to many others, including 90 percent of the people who had served in Congress since 1954, but he did not give their names or estimate the number of replies which he had received from them. He contends that the letters which he had received bearing the signatures of these well known people have a market value and that he is entitled to recover that value.
Mr. Allen Nicoll was qualified as an expert appraiser and he testified that he has had considerable experience in appraising correspondence files. He has never seen the correspondence file which plaintiff had accumulated and which was destroyed in the fire, but he did express an opinion as to the value of each letter which was described to him. He estimated that the 254 letters which plaintiff claims to have received from the 36 persons who were named had a market value of not less than $6,772.00 and not more than $28,610.00. This appraisal, of course, was based on the assumption that the signature on each of these letters were genuine. He also valued the copies of the letters which plaintiff had written to these persons at five percent of the value of the reply.
Neither plaintiff nor any other witness was able to testify that the signature on any of these letters was genuine. Mr. Harold B. McSween, who served as a member of Congress from 1959 until 1963, testified that the volume of mail received by senators and representatives was such that it was impossible for the letters which issued from their offices to be handled personally by them. He stated that each senator and congressman is provided with a staff, that most of the correspondence is handled by members of his staff and that “there was a significant amount of mail that it was impossible to be signed by either a house member or a senator.”
The trial judge, in rejecting plaintiff’s demand for damages for the loss of this correspondence file, said'-
“The next item for discussion is the personal correspondence file of Mr. Har-well. Mr. Harwell was a prolific letter writer and any time a public official did something he did not agree with, he would write him a letter. In most instances he got a reply to his letter. These reply letters were filed away and were lost in the fire. The Court cannot allow any recovery for these because there is no proof that these reply answers bore the signature of the particular person. The evidence was quite clear that unless it was a genuine signature it was of no value at all. There is no proof that it was a genuine signature but on the contrary the probabilities are that these signatures were not genuine.”
We conclude, as did the trial judge, that the evidence fails to establish that the signatures on the original letters contained in plaintiff’s personal correspondence files were genuine. We concur in the trial court’s finding, therefore, that plaintiff is not entitled to an award of damages for the loss of these correspondence files.
For the reasons herein set out, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.